**T. J. NELSON and wife, Katherine Nelson, Plaintiffs-Appellees,**

v.

**FORD MOTOR CREDIT COMPANY, Defendant-Appellant.**

Court of Appeals of Tennessee,
Eastern Section.

June 17, 1981.

Permission to Appeal Denied by Supreme Court Oct. 5, 1981.

George F. Legg, Lawrence F. Giordano, R. William Crowe, Knoxville, for defendant-appellant; Stone & Hinds, P. C., Knoxville, of counsel.

Jack H. McPherson, Jr., McPherson & Blevins, Kingston, for plaintiffs-appellees.

## OPINION

FRANKS, Judge.

Ford Motor Credit Company appeals judgments by jury verdicts aggregating $6,000.00 compensatory damages and $3,000.00 punitive damages in favor of T. J. and Katherine Nelson, debtors of defendant, based on the tort of outrageous conduct.

Defendant insists it was entitled to directed verdicts in its favor.

In considering this issue, we are required to evaluate the evidence in the most favor-

able light to sustenance of the jury verdicts. *Crabtree Masonry Co. v. C & R Const., Inc.,* 575 S.W.2d 4 (Tenn.1978).

The evidence in this context is: On January 31, 1976, plaintiffs purchased an automobile, utilizing installment credit with payments of $119.89 for 42 months. Payments were made on time and a payment due on May 12, 1977 was mailed by plaintiffs on April 30, 1977, but was not credited to their account. For reasons not clear from the record, but it can be inferred plaintiffs were not at fault, this check was credited to a debt owed by plaintiffs to the General Electric Credit Company, thereby causing the Ford Motor Credit account to fall in arrears, setting in motion a series of debt collection practices plaintiffs cite as the gravamen of their action.

Later in May, 1977, defendant mailed notice the payment had not been received. This was ignored by plaintiffs since they had mailed their payment. A representative of defendant then contacted Katherine Nelson by phone; she explained that the payment had been mailed on April 30. Within a short period of time, in another telephone contact, the same explanation was given by plaintiffs and Ford's representative suggested that a copy of the cancelled check be furnished Ford, which plaintiffs did. At the request of Ford, the plaintiffs were asked to send two checks at the time of the June payment, one to cover the May payment if it had not actually been paid. Plaintiffs complied with this request and within a few days Ford's representative Wynn contacted plaintiffs and, after further discussion, advised that the second check accompanying the June payment would be credited to the July payment. However, Ford credited this check to the

May payment causing the July payment to go unpaid. At this juncture, plaintiffs' payment schedule became one month in arrears and, as each subsequent monthly payment was received, Ford credited it to the prior month creating a situation where plaintiffs were one month in arrears at all times under Ford's computerized billing process. Beginning in July of 1977, defendant began sending plaintiffs late payment notices, adding a late payment service charge of $5.99 to the bill each month. These notices continued on a monthly basis to July, 1978, accumulating an aggregate late charge of $71.88. Plaintiffs testified that these payment reminders significantly upset Katherine. She testified a payment reminder was received on August 26, 1977, on the date of her daughter's wedding and, as she was already anxious over wedding preparations, she became extremely upset and cried uncontrollably when she learned of the receipt of yet another notice. On this occasion, Nelson called a representative of defendant, who advised defendant could not clear the Nelson's account due to their inability to read the endorsement on the copy of the check. A request for another photocopy was angrily refused by Nelson.

No further personal contact occurred between the parties until March of 1978; however, beginning on November 1, 1977, Ford began sending payment reminders, hand addressed and signed by an employee of defendant. These notices were couched in stronger language,[1] and were sent to plaintiffs on January 4 and February 1, 1978. On February 3, 1978, plaintiffs received another payment reminder threatening repossession of the automobile.[2] Katherine testified that this contact was extremely upsetting to her as she was employed by

---

1. Dear Customer,

   As you know, your account is past due. Unfortunately, you have not called me as I have requested.

   Frankly, I am in the dark as to why you have not made your payment and this leaves me in an awkward position. I do not want to appear demanding or unreasonable, but your silence limits my ability to determine what future action should be taken for both of our benefits.

   Our primary objective at Ford Credit is to assist customers in financing their automobiles and other products. Please phone me immediately so that I may provide any service I can for you.

2. Dear Customer,

   Once again, I am writing with regard to the payment that has not been made on your account. The past due condition of your account is now serious.

the Sheriff's Department of Roane County and feared the embarrassment she would endure if defendant served repossession papers through her employer. She testified she suffered crying spells, headaches, a sick stomach and irritability with her family following this episode and, as a result of tension, she and T. J. talked of separating.

On March 1, 1978, Katherine was contacted by Ford's representative Farley, who became abusive with her and when she became confused he called her "dumb" and told her that she "didn't know anything."

The Nelsons filed this action on March 7, 1978. At that time defendant, in cooperation with the Fulton National Bank, caused the check mailed by the Nelsons on April 30, 1977, to be credited to the Nelsons' account as of April 4, 1978. Subsequent to the April 4 date, however, two additional payment reminders were sent to the plaintiffs and, on May 18, 1978, plaintiffs received another letter from defendant seeking to collect $59.90 in late charges accruing through April, 1978. The letter implicitly threatened plaintiffs' credit rating if the charges were not paid. Finally, on August 8, 1978, Ford properly credited the Nelsons' account, withdrawing the claimed late charges.

Katherine testified the described series of events caused a great embarrassment, anxiety and anger from and after the first notice of late payment. She testified each notice made her cry and caused her to be irritable with her family. She testified as the notices multiplied and became more threatening she became more nervous and irritable, suffering headaches and an upset stomach. T. J. testified he suffered tension and anxiety due to his wife's reactions; neither plaintiff consulted a physician nor missed time from work due to their emotional distress.

Tennessee cases have repeatedly stated:

Our next step must be to repossess the car. We hate to do this and we are sure you do not relish it either. Repossession will not do your credit reputation any good. If it is necessary, after we sell the car and apply the proceeds to your account, there may still be an amount owing. We will be asking you to pay any balance.

Liability for the tort of "outrageous conduct" exists only where (1) the conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury.

*Swallows v. Western Elec. Co., Inc.,* 543 S.W.2d 581 (Tenn.1976), at 582, quoting *Medlin v. Allied Investment Co.,* 217 Tenn. 469, 398 S.W.2d 270 (1966).

Formulating an objective legal standard or test for determining whether reasonable minds would differ on whether the actor's conduct is so intolerable as to be tortious has been especially difficult for courts considering the issue. *Goldfarb v. Baker,* 547 S.W.2d 567 (Tenn.1977). It is, of course, the duty of the court to determine whether the evidence presented has established the elements of the tort. *See* Comments h and j to § 46, *Restatement of Torts (Second).* The oft-quoted standard or test is embodied in Comment d to § 46, *Restatement of Torts (Second)* :

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down,

Your bringing the account current immediately will make all of this unnecessary. Please send your check for the past due payment. Repossession would be a serious and unfortunate matter for both of us.

and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.

This language is frequently repeated in Tennessee cases as the requirement for recovery in outrageous conduct cases. *See Foster v. Trentham's, Inc.*, 458 F.Supp. 1382 (E.D.Tenn.1978); *Hutson v. Shackleford*, 390 F.Supp. 997 (E.D.Tenn.1974); *Shelton v. Russell Pipe & Foundry Co.*, 570 S.W.2d 861 (Tenn.1978); *Moorhead v. J. C. Penney Co., Inc.*, 555 S.W.2d 713 (Tenn.1977); *Goldfarb, supra; Swallows, supra.*

The relationship of the parties is a significant factor in determining whether the acts are beyond the bounds of decency or intolerable in a civilized society, *i. e.*, the act occurring outside a particular relationship would not be considered outrageous but could well be within the confines of the parties' special relationship. The *Moorhead* case is an example. Comment e to § 46 of the *Restatement of Torts (Second)* recognizes this standard in the collecting creditor context. The comment states in pertinent part:

> The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.... In particular ... *collecting creditors* have been held liable for extreme abuse of their position.
>
> [Emphasis supplied.]

Example 7 to this comment sets forth activities which cumulatively exemplify outrageous conduct in a debtor-creditor context:

1. Sending a series of lurid letters threatening suit if the debt is not paid;
2. calling the debtor a deadbeat;
3. calling the debtor dishonest;
4. threatening to garnish the debtor's wages; and
5. threatening to bother the debtor's employer so much that the debtor will be fired.

The following example under this comment makes it clear, however, that merely seeking to collect a debt in a rude, insolent manner, such as by using insults, will not be sufficiently outrageous to sustain recovery.

■ The general rule set out in *Moorhead* is applicable to this case and is a creditor has a right to urge payment of a debt and to threaten to resort to proper legal processes to enforce collection, but where the creditor willfully or recklessly seeks to produce mental or emotional disturbances in the debtor for the purposes of forcing payment by using such methods as sending coarse and vindictive letters and threatening to appeal to the debtor's employer, the creditor may be held liable for extreme and outrageous collection tactics when these acts inflict mental or emotional distress upon his debtor. *Moorhead, supra*, at 718.

■ The evidence in this record does not establish the requisite abuse of the creditor's position to be actionable. The notices and the letters received by plaintiffs are routine, form collection notices and only two, by inference or incidentally, make any threats. These implied threats are the vehicle may be repossessed and the failure to pay the debt can result in poor credit rating. Both assertions may be considered logical consequences of the failure to pay an indebtedness. While the credit dispute was unreasonably drawn out and there were 20 pieces of correspondence from the creditor, the facts of this case are distinguishable in two significant particulars from *Moorhead*. The notices were not threatening and there was no deliberate threat to take the matter to the plaintiffs' employers, thus threatening their job security or damage their credit rating. Possible repossession of the vehicle through Katherine's employer's office was coincidental and it cannot be inferred the mention of repossession intended any consequence with plaintiff's employer. Likewise, the routine mailing of the late notice which arrived on the wedding date was fortuitous.

We set aside the jury verdicts, and reverse and remand this cause for the entry of an order of dismissal at plaintiffs' costs.

PARROTT, P. J., and SANDERS, J., concur.