WAVERLY D. CRENSHAW, JR., CHIEF UNITED STATES DISTRICT JUDGE
In this diversity action brought by Roger and Kerry Finley, Robyn Kelly[1] has filed a Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. No. 18). That Motion has been fully briefed by the parties (Doc. Nos. 19, 22 & 23), and, for the following reasons, will be granted in part and denied in part. Also pending is a Motion to Dismiss for improper venue or alternatively *902 to transfer (Doc. No. 5). That motion, too, has been fully briefed by the parties (Doc. Nos. 6, 8, 12, 14-1) and will be denied.
I. Background
Eliminating some of the legal conclusions (of which there are many), and toning down the hyperbole a tad, the Amended Complaint alleges the following relevant facts:
Robyn and Roger dated in high school and had a brief romantic relationship. Decades later, they reconnected on Facebook and arranged a meeting in Las Vegas. Robyn and her husband Padiac Kelly met Roger there in January 2013. The trio met again in Las Vegas in January 2014.
After the January 2014 meeting, Robyn and Roger never met again. They did, however, correspond for several months in 2014, and discussed rekindling their decades-old high school relationship. By September 2014, however, Roger decided that it was wrong for him to engage in such communications, and he informed Robyn that he did not wish to communicate with her further. This did not go over well.
In December of 2014, Robyn, utilizing a fake Facebook account, began sharing personal messages with Kerry that she had received from Roger. This prompted Kerry to block Robyn on Facebook. Thwarted, Robyn changed tactics by "leaving lengthy voicemails and sending literally hundreds of emails to Roger," that included "threats of public disclosure of private facts" and "contained vitriolic attacks on Roger and vicious and frightening attacks on his wife, Kerry." (Doc. No. 9, Am. Cmpt. ¶ 15)
Roger, too, was forced to shut down his personal Facebook account, but could not change his work email. He tried to block messages from Robyn, but she would circumvent this by creating a "myriad [of] new email accounts," through which she sent "messages several times per week to his work email system from late 2014 into the late spring or 2018." (Id. ¶ 17). Some emails threatened to get Roger fired from his job, while others referred to him by "a string of defamatory invective[s] such as, 'sociopath,' 'abuser,' 'monster' and (in just one notable email) as 'a lunatic, psycho, loser, creep.' " (Id. ¶ 19). Some emails suggested that Roger was physically and/or emotionally abusive towards Robyn and other women, that he had mental health problems, and problems with alcohol abuse. Other emails attacked Kerry, suggesting that she, too, was abusive, and was "evil," even though Robyn had never met Kerry. (Id. ¶ 20).
Robyn routinely threatened to " 'expose" Roger to a 'larger audience' and made other clear threats that she would inform third parties of her 'beliefs' about Roger - i.e. , the ... false assertions that Roger is an abusive romantic partner and a belligerent alcoholic, and his wife Kerry has physically threatened her - and provide those individuals with copies of the messages sent privately by Roger to Robyn." (Id.). Robyn made good on those threats when, utilizing the "handle Grace Squad," she created a Facebook account and uploaded a 79-page "Document" that included private exchanges and photos between her and Roger. The Document was prefaced with an introductory 15-page, single spaced narrative that contained many of the same "salacious" claims, "accusations," and "vitriolic attacks" she had unleashed before in her private communications with Roger and Kerry. (Id. ¶¶22-24). The Document was sent to at least 18 individuals, some of whom were Plaintiffs' family members and personal friends.
In addition to repeating a lot of what had been said earlier, the narrative portion of the Document "describes Roger as 'a psycho and pathological liar," "obsessive,"
*903 "an abuser," and "a "stalker" who purportedly "mistreated" and "threatened Robyn." (Id. ¶ 24). The Document also states that Roger was "a drunk," "mentally unhealthy," and that a psychologist friend of Robyn's indicated that Roger's behavior "fit every definition and description of a sociopath." (Id. ¶ 25). The Document also attacks Kerry, claiming that the Finley's had "an abusive relationship," and that Kerry was belligerent, threatening and "abus[ive] to Roger." (Id. ¶ 28). The Document continues in the same vein, but this is more than enough to describe its essence and place the parties' arguments in context.
II. Motion to Dismiss For Improper Venue or Alternatively to Transfer
In response to the initial Complaint, Robyn filed a combined Motion to Dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and a Motion to Dismiss for lack of jurisdiction under Rule 12(b), or alternatively transfer venue pursuant to 28 U.S.C. § 1404(a). (Doc. No. 5). In response to the Amended Complaint, however, Robyn filed only a Rule 12(b)(6) motion, but stated in a footnote in her accompanying Memorandum that "she maintains her arguments that venue is improper that were raised in her first motion and developed in subsequent filings." (Doc. No. 19 at 1, n.1). The record would have been less confusing if Robyn had simply renewed her venue/transfer motion in response to the Amended Complaint. Regardless, to the extent Robyn is still pursing this motion, it will be denied.
Relying on 28 U.S.C. § 1391, Robyn asserts that venue is improper in this Court because none of the provisions of subsection (b) of that statute apply. She is, after all, a resident of California, not Tennessee, a substantial part of the events did not occur in this state, and the action could have been brought in the Northern District of California. All of this may be true, but this action was removed from state court and "venue in removed actions is governed solely by § 1441(a)." Kerobo v. Sw. Clean Fuels, Corp., 285 F.3d 531, 534 (6th Cir. 2002) (citing Polizzi v. Cowles Magazines, Inc., 345 U.S. 663, 665, 73 S.Ct. 900, 97 L.Ed. 1331 (1953) ). In other words, "[t]here is only one federal venue into which a state court action may be removed, and that is in the statutorily dictated 'district court ... for the district and division embracing the place where [the state court] action [was] pending.' 28 U.S.C. § 1441(a)" Id. Venue is proper here because this Court (and in particular the Nashville Division) embraces Williamson County from which this case was removed.
Turning to the request to transfer, § 1404 provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought[.]" 28 U.S.C. § 1404(a). As that permissible language suggests, "district courts have broad discretion to determine when convenience or the interests of justice make a transfer appropriate." Doe v. United States, No. 3:16-CV-0856, 2017 WL 4864850, at *2 (M.D. Tenn. Oct. 26, 2017) (citing Reese v. CNH America LLC, 574 F.3d 315, 320 (6th Cir. 2009) ). "The burden of proving that transfer is warranted is on the moving party[.]" Id. The burden is "a substantial one" and "requires a clear and convincing showing that the balance of convenience strongly favors the alternate forum." Id. ; see, Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.");
*904 W. Am. Ins. Co. v. Potts, 908 F.2d 974 (6th Cir. 1990) (A motion for change of venue is properly granted when the balance weighs 'strongly in favor of transfer.' ")
"To resolve a motion to transfer venue, a court considers: the plaintiff's choice of forum, the convenience of the witnesses and the residence of the parties, the location of sources of proof, including the availability of compulsory process to insure witness attendance, the location of the events giving rise to the dispute, any obstacles to a fair trial, the advantage of having the dispute adjudicated by a local court, and all other considerations of a practical nature that make a trial easy, expeditious, and economical." Maples v. United States, No. 3:17-CV-00912, 2018 WL 943213, at *1-2 (M.D. Tenn. Feb. 16, 2018) (citing LP Envtl., LLC v. Delfasco, LLC, 2015 WL 13145788, at *2 (M.D. Tenn. Feb. 25, 2015) ; Nollner v. S. Baptist Convention, Inc., 2014 WL 3749522, at *7 (M.D. Tenn. July 30, 2014) ). Robyn did not address those factors in her opening brief, but in her reply she insists that "[t]hree of the six factors support transferring this action to the Northern District of California, two are neutral, and additional practical considerations support transfer as well." (Doc. No. 12 at 4). The Court disagrees.
"Generally, one of the most significant factors in considering whether venue should be transferred is the plaintiff's choice of forum," and, therefore, " 'plaintiff's choice of forum is usually entitled to 'substantial consideration' in balancing the § 1404(a) factors." Smith v. Kyphon, Inc., 578 F. Supp. 2d 954, 962 (M.D. Tenn. 2008). While Robyn cites a couple of district court cases for the proposition that " '[a] plaintiff's choice of forum is entitled to somewhat less weight when the case is removed to federal court because the plaintiff is no longer in his or her chosen forum," (Doc. No. 4 at 12 (quoting SKY Techs. Partners, LLC v. Midwest Research Inst., 125 F. Supp.2d 286, 292 (S.D. Ohio 2000) ), the fact remains that Roger and Robyn chose to pursue this case in their home state. The Court gives this substantial consideration because "a more appropriate analysis is whether a plaintiff has any connection to a chosen forum, not whether a plaintiff selected state or federal court." Walnut Private Equity Fund, L.P. v. Argo Tea, Inc., No. 1:11-CV-770, 2011 WL 6013000, at *13 (S.D. Ohio Dec. 2, 2011) (quoting Apex Sales Agency v. Phoenix Sintered Metals, Inc., No. 1:06 CV 01203, 2006 WL 3022987, at *2 n.1 (N.D. Ohio Oct.23, 2006) ).
Robyn conclusorily asserts that "[t]he convenience of the witnesses does not weigh in favor of either party [because] the majority of witnesses in this case live in neither Tennessee nor California." (Doc. No. 12 at 5). However, in a declaration, Roger avers that the Document was apparently sent "to five (5) of my and my wife's friends in Tennessee; three (3) of my family members in Ohio; one (1) of my family members in Minnesota; two (2) of my family members in Florida; one (1) of my family members in Michigan; and one (1) of my family members in New Jersey." (Doc. No. 8-1, Roger Finley Decl. ¶ 5). All things considered, and in the absence of anything to the contrary, this factor favors Tennessee because most witnesses live either in this state, or at least closer to this state than California.
Next, Robyn argues that "the location of evidence factor" favors California because "Plaintiff's Complaint revolves around communications allegedly instigated by" her in California. (Doc. No. 12 at 5). She also asserts that "the majority of events did not occur in Tennessee." (Id. at 6). However, the location of evidence does not "carr[y] much weight in this age of technology."
*905 Doe v. University of Tennessee, 2016 WL 1253004, at *8 ; see also Flight Sols., Inc. v. Club Air, Inc., 2010 WL 276094, at *5 n. 7 (M.D. Tenn. Jan. 14, 2010) ("In light of current technology, which allows documents to be scanned and produced electronically, this does not factor heavily into the court's decision"). Further, while Robyn no doubt placed calls from California and utilized her computer there to send online messages and postings, her actions were directed at Robyn and Roger who live in Tennessee.
Robyn claims that a fair trial would be less likely because "Plaintiffs would have a substantial 'home court advantage' in the Middle District of Tennessee" and she "will have to contend with the jury's natural tendency to feel biased against outsiders." (Id.). However, the whole point of diversity jurisdiction is to lessen "the insidious home-court advantage." Adkins v. Advocat Inc., No. CIV.A. 14-152-HRW, 2015 WL 1802838, at *4 (E.D. Ky. Apr. 17, 2015) ; see also Regis Assocs. v. Rank Hotels (Mgmt.) Ltd., 894 F.2d 193, 196 (6th Cir. 1990) ("We realize that some litigants perceive certain "home court" advantages in litigating in a state court. However, this is one of the reasons why diversity jurisdiction still exists."). Besides, jurors will be instructed to set aside biases (both real and implicit) and "jurors are presumed to follow the trial court's instructions." United States v. Bradley, 917 F.3d 493, 508 (6th Cir. 2019) (citation omitted).
Finally, Robyn argues that "other considerations also support a transfer," including that "[t]his lawsuit is, frankly, frivolous," and "opening the doors of the Middle District of Tennessee to these kinds of cases will further congest the district's already crowded dockets with unnecessary lawsuits based on the all-too-common occurrence of people engaging in online romantic relationships." (Id. at 6, 7). Leaving aside that Robyn does not offer any evidence to suggest that the docket in the Northern District of California is less congested, this is not a case simply about "online romantic relationships." Nor is it "frivolous," as evidenced by the following discussion that permits two of Plaintiffs' claims to proceed. Accordingly, her Motion to Dismiss for lack of jurisdiction or alternatively to transfer will be denied.
III. Motion to Dismiss
Based primarily upon the Document, Roger and Kerry bring state causes of action for defamation (Count One); invasion of privacy via the public disclosure of private facts (Count Two) and intrusion upon seclusion (Count Three); and the negligent (Count Four) and intentional (Count Five) infliction of emotional distress. Robyn has moved to dismiss all of these claims.
A. Standard of Review
Because Robyn seeks dismissal for failure to state a claim, the Court's task at this juncture is to determine whether the Amended Complaint "contains sufficient factual matter, accepted as true, 'to state a claim for relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). The plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. To allow such an inference to be drawn, the complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions or a formulaic recitation of the elements of a cause of action." Id. Although the Court must " accept all well-pleaded factual allegations *906 in the complaint as true," it need not accept legal conclusions "couched as a factual allegation." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 ; see also 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B., 727 F.3d 502, 504 (6th Cir. 2013) (discussing Iqbal and Twombly in conjunction with the pleading requirement of Rule 8(a)); Weisbarth v. Geauga Park Dist., 499 F.3d 538, 542 (6th Cir. 2007) (discussing Iqbal and " Twombly's effect on the dismissal standard").
B. Defamation
"A claim for common law defamation may be based upon written (libel) or spoken (slander) words." Battle v. A & E Television Networks, LLC, 837 F. Supp. 2d 767, 770 (M.D. Tenn. 2011) (citing Quality Auto Parts Co., Inc. v. Bluff City Buick Co., 876 S.W.2d 818, 820 (Tenn. 1994) ). Whatever the method utilized, "the basis for an action for defamation... is that the defamation has resulted in an injury to the person's character and reputation." Davis v. The Tennessean, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001).
"To establish a prima facie case of defamation in Tennessee, the plaintiff must establish that: 1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d 569, 571-72 (Tenn. 1999) (citing RESTATEMENT (SECOND) OF TORTS § 580 B (1977)). " 'Publication is a term of art meaning the communication of defamatory matter to a third person.' " Id. at 572 (quoting Quality Auto Parts, 876 S.W.2d 818 at 821. "The question of whether a statement was understood in a defamatory sense generally is a question of fact for the trier of fact." Aegis Scis. Corp. v. Zelenik, No. M2012-00898-COA-R3CV, 2013 WL 175807, at *6 (Tenn. Ct. App. Jan. 16, 2013) ; Battle, 837 F. Supp.2d at 771. "However, the preliminary question of whether a statement 'is capable of conveying a defamatory meaning' presents a question of law." Id. (citing Revis v. McClean, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000) ).
In deciding whether a statement is defamatory in the context of a motion to dismiss, the Tennessee Court of Appeals has observed:
A trial court may determine that a statement is not defamatory as a matter of law only when "the statement is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense." ... When considering whether a statement is capable of being defamatory, it must be judged within the context it is made.....Additionally, it "should be read as a person of ordinary intelligence would understand [it] in light of the surrounding circumstances." ... To this end, courts are not bound to the plaintiff's interpretation of the allegedly defamatory material, and if the words "do not reasonably have the meaning plaintiff ascribes to them, the court must disregard" plaintiff's interpretation.
Grant v. Commercial Appeal, No. W201500208COAR3CV, 2015 WL 5772524, at *10 (Tenn. Ct. App. Sept. 18, 2015) (internal citations omitted). Thus, "[i]n making the determination of whether a communication is capable of being understood as defamatory, '[t]he courts of this state have consistently followed the prevailing common-law practice of construing the allegedly libelous words in their plain and natural import.' " McWhorter v. Barre, 132 S.W.3d 354, 364-65 (Tenn. Ct. App. 2003) (quoting Memphis Pub. Co. v. Nichols, 569 S.W.2d 412, 419 n. 7 (Tenn. 1978) ). Still, context matters:
*907 [C]ourts reviewing defamation cases should review the statement in the "full context of the communication in which the statement is made; and consideration of the broader social context surrounding the communication." ... "Isolating [statements] and first extracting [their] express and implied factual statements, without knowing the full context in which they were uttered, indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context." ... This comports with our duty to consider not just isolated statements, but also "[t]he import of [the] language as a whole" to determine whether a communication may be deemed defamatory.
Grant, 2015 WL 5772524, at *10 (Tenn. Ct. App. Sept. 18, 2015) (internal citations omitted); see also, Aegis, 2013 WL 175807 at *6 ("A statement alleged to be defamatory must be judged within the context in which it was made"). In short, "[i]n determining whether a statement is capable of a defamatory meaning, the '[a]llegedly defamatory statements should be judged within the context in which they are made,' and given their usual meaning, 'as a person of ordinary intelligence would understand them in light of the surrounding circumstances.' " Battle, 837 F. Supp. 2d at 771 (citation omitted).
Based on the allegations in the Amended Complaint, Robyn argues that (1) "references to Roger as a 'sociopath,' 'abuser,' 'monster,' and 'a lunatic, psycho, loser, creep,"; (2) "claims that Roger has problems with alcohol abuse, was belligerent to others in Las Vegas, suffers from mental illness, and is a stalker who made Mrs. Kelly feel afraid"; and (3) "claims that Kerry is abusive, has engaged in threatening behavior towards Roger, and is in an 'abusive relationship' with him," are not defamatory as a matter of law. (Doc. No. 19 at 5). Instead, Robyn submits, calling someone names like "monster, psycho, loser or creep" are "not factual assertions that can be true or false," but are "paradigmatic example of 'loose;' and 'hyperbolic language.' " (Id.). "Similarly, describing someone as a "sociopath," "abusive," or a "stalker" is "loose, figurative, or hyperbolic," thereby "negat[ing] the impression that the author seriously is maintaining an assertion of actual fact." (Id.) Robyn further contends that "[a]llegations of threats and mistreatment," and "the charge that Roger was belligerent to third parties" are matters of opinion and belief, not statement of facts. (Id. at 6). Finally, Robyn submits that "[a]lcoholism is widely acknowledged to be a disease, not a moral failing that holds the sufferer up to 'public hatred' or 'contempt," and the same is true regarding an allegation that someone suffers from mental illness." Id.
Robyn's arguments fail for at least two reasons. First, while calling someone a monster or a creep may not be defamatory because it is hyperbole or an expression of opinion, referring to someone as a stalker can be. See e.g., Cross v. Receivables Mgmt. Sols., Inc., No. 04 CV 01493 MSK PAC, 2006 WL 446083, at *5 (D. Colo. Feb. 21, 2006) (observing that "statement that a person is a stalker is defamatory as a matter of law because it attributes criminal activity to such person, but a statement that such person 'would show up everywhere his wife went' is not defamatory as a matter of law because additional information is required for it to have a defamatory meaning); Bryan v. Eichenwald, No. CIV. A. 992543CM, 2001 WL 789401, at *3 (D. Kan. June 8, 2001) (stating that calling someone a stalker imputes a crime and can be defamatory); Allen v. Thomson Newspapers, Inc., 893 So. 2d 227, 232 (La. App. 2005) ; (holding that even if defendant did not know stalking is a crime, by calling *908 plaintiff a stalker "he has imbued [plantiff] with criminal behavior [and] thus, his statement was defamatory per se"). The same is true of calling someone a sociopath or a drunk. See e.g., MacDonald v. Jacobs, 171 N.H. 668, 201 A.3d 1253, 1259 (2019) (characterizing "defamatory statements made by the defendant in this case" as including "assertions that the plaintiffs are liars and sociopaths," "stalked her," and "are alcoholics"); Bonnett v. Theriot, 491 So. 2d 703, 705 (La. Ct. App. 1986) (calling defendant "a drunk" in front of a number of bystanders was sufficient to state a defamation claim); Choi v. Kyu Chul Lee, 312 F. App'x 551, 555 (4th Cir. 2009) (indicating that properly instructed jury may or may not find that calling someone a drunk and indicating that they acted less than admirably while intoxicated is defamatory); Hayes v. Sweeney, 961 F. Supp. 467, 481 (W.D.N.Y. 1997) (observing that "imputation of alcohol consumption is defamatory when accompanied by some aggravating factor, such as the suggestion that conduct is habitual or that the person is 'a drunk' ").
Second, Robyn focuses solely on the language of the Amended Complaint, and complains that Plaintiffs quote assorted statements from the Document in their reply brief. She asks that
the Court decline to consider statements that Plaintiffs could have easily included in their original or first amended complaint but failed to plead. Indeed, Plaintiffs' failure to include these statements in their amended complaint means that they have now missed two opportunities to meet their pleading obligations. They should not be permitted to make an end-run around their obligation to provide fair notice of their claims for relief in their pleading.... Plaintiffs have actually admitted what "forms the essential basis of Plaintiffs' claims." ... Yet they inexplicably chose not to refer to any of the specific statements from the Document that they now attempt to use to support their argument. This Court should not allow Plaintiffs a third bite at the apple to correct their pleading deficiencies.
(Doc. No. 25 at 1-2).
By referring to specifics from the Document, Plaintiffs are not taking a third bite at the apple, nor can Defendant claim any surprise by that reference. The Document is mentioned in the Amended Complaint no less than a dozen times, and quoted and described in detail. Moreover, it is specifically "incorporated [t]herein by reference[.]" Unless insufficiently mentioned or tangential to a claim, "documents incorporated by reference must be considered part of the complaint[.]" In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 467-68 (6th Cir. 2014). In fact, "a court may consider a document not formally incorporated by reference in a complaint when the complaint refers to the document and the document is central to the claims." Nixon v. Wilmington Tr. Co., 543 F.3d 354, 357 n.2 (6th Cir. 2008) (citing Greenberg v. Life Ins. Co. of Va., 177 F.3d 507, 514 (6th Cir.1999) ). Thus, Plaintiffs were at liberty to quote from the Document in their reply brief, plus it served the salutary purpose of ensuring that the Court was not like a boar "hunting for truffles," Emerson v. Novartis Pharm. Corp., 446 F. App'x 733, 736 (6th Cir. 2011) (citation omitted), or a gold prospector looking for nuggets supporting the defamation claim. Besides, the Amended Complaint itself contains sufficient allegations to support Plaintiffs' defamation claim because the Court cannot say that the statements alleged to have been made by Robyn were not reasonably capable of any defamatory meaning. Accordingly, the defamation claim will not be dismissed.
*909 C. Invasion of Privacy
1. Public Disclosure of Private Facts
Robyn argues that "Plaintiffs face an insurmountably high hurdle in bringing a public disclosure of private facts claim, since the case law provides that this tort is not favored in Tennessee," and "[i]n fact, there is not a single case from Tennessee state or federal courts finding that a plaintiff stated a viable claim for public disclosure of private facts." (Doc. No. 19 at 8). This is an awfully broad statement to make, unless counsel has reviewed the docket of each and every civil case that has been filed in Tennessee state and federal court to determine whether a such a claim has proceeded beyond dismissal. What the fifty or so cases (published and unpublished) that have been reported online show is that, while "[t]he Tennessee Supreme Court has not expressly recognized the public disclosure of private facts form of invasion of privacy," Rutherford v. First Tenn. Bank Nat. Ass'n, No. 3:08-CV-19, 2008 WL 3307203, at *6 (E.D. Tenn. Aug. 7, 2008), "Tennessee courts of appeal have recognized this tort," Hoffman v. GC Servs. Ltd. P'ship, No. 3:08-CV-255, 2010 WL 9113645, at *20 (E.D. Tenn. Mar. 3, 2010). What the cases also show, however, is that most are dismissed because "[e]ssential to sustaining this cause of action is a showing of a public disclosure of private facts," and "[c]ommunication to a single individual or to a small group of people, absent breach of contract, trust or other confidential relationship will not give rise to liability." Jackson & Assocs., Ltd. v. Christl, No. 01A019103CV00081, 1991 WL 155687, at *3 (Tenn. Ct. App. Aug. 16, 1991) (emphasis in original); see, Gentry v. E. I. DuPont De Nemours & Co., No. C.A. 765, 1987 WL 15854, at *4 (Tenn. Ct. App. Aug. 18, 1987) ; Garmley v. Opryland Hotel Nashville, LLC, No. 3:07-0681, 2007 WL 4376078, at *3 (M.D. Tenn. Dec. 13, 2007) (affirming dismissal where allegations showed that disclosure was only made to the employer); Beard v. Akzona, Inc., 517 F. Supp. 128, 133 (E.D. Tenn. 1981) (finding dismissal appropriate where "only a few ... employees heard the tape recorded message initially and were told not to repeat it").
Here, in moving to dismiss on the familiar ground that the allegedly defamatory statements were insufficiently published, Robyn acknowledges that "the case law does not provide a 'magic number' of recipients that must receive a message for it to be considered 'public' disclosure[.]" Doc. No. 19 at 8). She points out, however, that "[s]ix to eight" people" was found to be insufficient in Cawood v. Booth, 2008 WL 4998408, at *4, *9 (Tenn. Ct. App. Nov. 25, 2008) and speculates that because the insufficient disclosure in Garmley was to a "corporate employer ... the information may have been received by many more than [the] eighteen people" that are alleged to have received the Document in this case.
Even though Tennessee courts appear not to have addressed the issue, a number of courts when considering the tort of public disclosure of private facts have endorsed an exception that holds that the publicity element may be satisfied where the information is released to a small number of persons who have a special relationship with the plaintiff, such as family members. Lozier v. Quincy Univ. Corp., No. 3:18-CV-3077, 2019 WL 409368, at *9 (C.D. Ill. Jan. 31, 2019) ("The publicity requirement can be met by alleging that the disclosure was made to a small number of people who have a special relationship with the plaintiff[.]"; Walgreen Co. v. Hinchy, 21 N.E.3d 99, 112 (Ind. Ct. App. 2014)) (reiterating case law that even if "disclosure were not made to the general public, it could still be actionable if made to a *910 'particular public' with a special relationship to the plaintiff, such as co-workers, family members, or neighbors"); Hill v. MCI WorldCom Commc'ns, Inc., 141 F. Supp. 2d 1205, 1212 (S.D. Iowa 2001) (internal citation) (adopting the exception and stating that if the "publicity requirement were strictly applied to every conceivable set of facts, it would undermine general privacy law's goal of securing a person's 'right ... to be let alone, to live a life of seclusion, [and] to be free from unwarranted publicity"). Others have not. See e.g., Burger v. Blair Med. Assocs., Inc., 600 Pa. 194, 964 A.2d 374, 379 (2009) (collecting contrary authority but noting that, "under prevailing Pennsylvania law, such disclosures to a small number of persons do not constitute publicity"). Still others have failed to take a position one way or the other. See e.g., Fernandez-Wells v. Beauvais, 127 N.M. 487, 983 P.2d 1006, 1008 (1999) (noting the varying approaches but refusing to adopt position because facts did not allow for liability even with the exception).
If Tennessee courts were to adopt this exception, then Plaintiffs easily state a plausible claim. They allege that the Document was provided to their relatives and friends, which, at least arguably, "makes the disclosure as devastating as disclosing the information to the public at large." Lozier, No. 3:18-CV-3077, 2019 WL 409368, at *9. Fortunately, however, the Court need not divine what the Tennessee courts might do because, even if publication must be broader, plaintiffs have alleged a plausible allegation that the allegedly defamatory statements were further distributed. Though professing "not ... to make this a #metoo revelation," Robyn states in the Document that, "my husband and I have shared this story and information with family and friends." (Doc. No. 21 at 1). Moreover, because the Document was shared in digital format, it would not take much to resend the Document to others. Only discovery can sort out this issue.[2] Plaintiffs' public disclosure of private facts claim will not be dismissed.
2. Intrusion upon Seclusion
Just as with the tort of public disclosure of private facts, the Tennessee Supreme Court has yet to recognize intrusion upon seclusion as a separate cause of action for invasion of privacy, but the Tennessee Court of Appeals has and "the scope of this tort is parallel to that contained in section 652B of the Restatement (Second) of Torts." Givens v. Mullikin ex rel. Estate of McElwaney, 75 S.W.3d 383, 411 (Tenn. 2002). Under the Restatement, "the defendant is subject to liability ... only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." Restatement (Second) of Torts § 652 B (1977). This *911 "requires the plaintiff to plead and prove three elements: (1) an intentional intrusion, physical or otherwise; (2) upon the plaintiff's solitude or seclusion or private affairs or concerns; (3) which would be highly offensive to a reasonable person." Burnette v. Porter, No. W2010-01287-COA-R3CV, 2011 WL 4529612, at *4 (Tenn. Ct. App. Sept. 30, 2011). "The essential question to be answered with respect to this issue, then, is whether the complaint has pled facts showing that [defendant] 'invaded a private seclusion that the plaintiff[s have] thrown about [their] persons or affairs." Givens, 75 S.W.3d at 412. Here, that question must be answered in the negative.
"[T]he finding of an intrusion is tied to the plaintiff's expectation of privacy," and "in order to prove that there has been an intentional intrusion into a private place, conversation or matter, the plaintiff will usually have to prove that there was: (1) an actual, subjective expectation of seclusion or solitude in that place, conversation or matter; and that (2) that expectation of privacy was objectively reasonable." Burnette, 2011 WL 4529612 at *4. Thus, for example, "opening plaintiff's private mail and reading it without authority" is an intrusion into privacy, Vernars v. Young, 539 F.2d 966, 969 (3d Cir.1976), but plaintiff does not have a reasonable expectation of privacy in what she throws into the trash even if she "had a subjective expectation that her trash would remain private," Danai v. Canal Square Associates, 862 A.2d 395, 402 (D.C. 2004). Likewise, "hacking into a person's private computer and stealing personal correspondence [represents] an intentional intrusion on the victim's private affairs," Coalition for Airline Passengers' Bill of Rights v. Delta Air Lines, Inc., 693 F.Supp.2d 667, 675 (S.D. Tex. 2010), but a plaintiff does not have "a reasonable expectation of privacy in words he had already conveyed to a third party that the third party then decided to disclose," Robinson v. Renown Reg'l Med. Ctr., No. 316CV00372MMDWGC, 2016 WL 7031910, at *4 (D. Nev. Aug. 23, 2016).
"The maxim of law that one 'who consents to an act is not wronged by it' applies to the tort of invasion of privacy," and "[t]he right of privacy may be waived or lost by consent." Burnett, 2011 WL 4529612 at 5. Here, Roger may have subjectively believed that he and Robyn had reached some sort of understanding regarding their exchange of communications via email and messaging, but when he hit the send button he lifted the cloak "thrown about his person or affairs" in relation to those messages and placed his fate in Robyn's hands. Accordingly, Plaintiffs' intrusion into seclusion claim will be dismissed.
D. Intentional Infliction of Emotional Distress
The elements and scope of a cause of actions for the intentional infliction of emotional distress have recently been overviewed by this Court as follows:
In Tennessee, the tort of intentional infliction of emotional distress ("IIED") is synonymous with the tort of outrageous conduct. Lyons v. Farmers Ins. Exch., 26 S.W.3d 888, 893 (Tenn. Ct. App. 2000). Under Tennessee law, a plaintiff must establish the following elements to support a claim for IIED: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997). To say that Tennessee courts narrowly define "outrageous conduct" would be something of an understatement. The conduct *912 must be "atrocious," "utterly intolerable," and "beyond all bounds of decency." Goldfarb v. Baker, 547 S.W.2d 567, 569 (Tenn. 1977). As the Tennessee courts have explained:
In describing these elements, we have emphasized that it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress. A plaintiff must in addition show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.
Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004) (internal citations and quotation marks omitted) (emphasis added); see also Restatement (Second) of Torts § 46 cmt. d, at 73 (1965); Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 376 (6th Cir. 1999) (discussing standard under identical Ohio law). It is clear from this explanation that (a) the standard is not whether an aggrieved person (such as [plaintiff] ) considers a party's actions to have been so outrageous, but whether a civilized society would so find, and (b) a plaintiff must prove that the conduct is outrageous in character, and not just in motive. A plaintiff seeking damages for IIED must meet an "exacting standard." Miller v. Willbanks, 8 S.W.3d 607, 614 (Tenn. 1999). "Recovery for intentional infliction of emotional distress is limited to mental injury which is so severe that no reasonable person would be expected to endure it." Arnett v. Domino's Pizza I, L.L.C., 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003). "[T]he trial court may reasonably dismiss this legal theory as a matter of law." Lane v. Becker, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010).
Doe v. Belmont Univ., 334 F. Supp. 3d 877, 903 (M.D. Tenn. 2018).
As the foregoing suggests, " '[t]he standard for outrageous conduct is high, indeed,' Levy v. Franks, 159 S.W.3d 66, 85 (Tenn. Ct. App. 2004), and cases finding conduct sufficient to support an intentional infliction of emotional distress claim are few and far between." Cossairt v. Jarrett Builders, Inc., 292 F. Supp. 3d 779, 789 (M.D. Tenn. 2018). "Often cited in this regard is Johnson v. Woman's Hosp., 527 S.W.2d 133 (Tenn. Ct. App. 1975) where a mother was shown her deceased premature baby in a gallon jar of formaldehyde; Dunbar v. Strimas, 632 S.W.2d 558 (Tenn. Ct. App. 1981), where a mother (who had recently had a nervous breakdown) was told her infant daughter had been sexually abused and there was a large tear in her rectum where sperm cells were found, when, in fact, the child had suffered a "crib death," and Dunn v. Moto Photo, Inc., 828 S.W.2d 747 (Tenn. Ct. App. 1991) where plaintiff was told that her film could not be developed when, in fact, it had been developed and nude photographs of plaintiff were shown to other employees and plaintiff's acquaintances." Id. at 789-90. Roger's and Kerry's claims does not rise to anywhere near this level. This remains so even considering Nairon v. Holland, 2007 WL 626953 (Tenn. Ct. App. Mar. 1, 2007) and Moorhead v. J.C. Penney Co., 555 S.W.2d 713 (Tenn. 1977), which they claim to have presented "outrageous behavior ... similar in kind and degrees" as that experienced by them. (Doc. No. 22 at 22).
The Court need not discuss the facts in Moorhead beyond saying that it involved J.C. Penney failing to properly credit a $ 16.78 merchandise return, repeatedly promising to correct the error but failing to do so, doubling the amount due, sending 42 threatening letters, referring the matter *913 to a collections agency that continued the harassment, and admitting the error and cancelling the charge, only to open a new account with the same debt listed. This is because Moorhead serves as "an example" of the proposition that "[t]he relationship of the parties is a significant factor in determining whether the acts are beyond the bounds of decency or intolerable in a civilized society, i. e. , the act occurring outside a particular relationship would not be considered outrageous but could well be within the confines of the parties' special relationship." Nelson v. Ford Motor Credit Co., 621 S.W.2d 573, 576 (Tenn. Ct. App. 1981). In fact, "[t]he Restatement (Second) of Torts [which provides] the framework for intentional infliction of emotional distress in Tennessee," Miller v. Willbanks, 8 S.W.3d 607, 616 (Tenn. 1999), specifically recognizes that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests" and [i]n particular ... collecting creditors[.]" Restatement (Second) of Torts § 46 Comment e. See, MacDermid v. Discover Fin. Servs., 342 F. App'x 138, 143 (6th Cir. 2009) (citing Moorhead for the proposition that "Tennessee courts have previously recognized that aggressive debt collection practices can give rise to liability for outrageous conduct"); Nelson, 621 S.W.2d at 576 ("The general rule set out in Moorhead ... is a creditor has a right to urge payment of a debt and to threaten to resort to proper legal processes to enforce collection, but where the creditor willfully or recklessly seeks to produce mental or emotional disturbances in the debtor for the purposes of forcing payment by using such methods as sending coarse and vindictive letters and threatening to appeal to the debtor's employer, the creditor may be held liable for extreme and outrageous collection tactics when the actor inflicts mental or emotional distress upon his debtor."). Here, of course, there is no such relationship, and Moorhead does not further Plaintiffs' claim.
Nairon, too, can be viewed as a creditor/debtor outrageous conduct case in the sense that it involved Holland Medical Equipment's effort to recover a wheelchair, even though the decision never mentions such a relationship other than to discuss Moorhead and say that plaintiff's mother had rented the wheelchair. Regardless, and as Plaintiffs admit, "the underlying factual context is much different than here." (Doc. No. 22 at 21).
In Nairon, when plaintiff's mother died and the wheelchair she had been using was not returned, the owner of Holland Equipment began a months-long campaign of harassment against plaintiff. It started with a phone call to plaintiff in which the owner of the company called him a "jerk" and "Billy-bad-ass," told him to be afraid to answer the phone, and threatened to (1) make his life a "nightmare," (2) ring the "phone off the wall"; (3) call plaintiff's boss; and (4) "wear [him] out." 2007 WL 626953, at *1. In another phone call the owner again called plaintiff "a jerk," threatened to find him no matter where he went in the United States, promised to cost him "more in lost time, effort and energy than [he] could ever imagine"; and again told him to be afraid to answer the phone, both at home and at work. Id. at *2. In addition to these phone calls and seeing a Holland Equipment truck parked outside his home for hours,
plaintiff and his wife testified that, over the next several months, they received "hundreds" of "harassing" phone calls from Mr. Holland and other representatives of Holland Medical Equipment. The plaintiff estimates that the most *914 calls received from the defendants in a one-day time period was around 40. He estimates that the fewest number of calls received from the defendants in any one day was two. The plaintiff frequently chose not to answer the phone when he received a call from the defendants, thereby permitting the phone to ring until the other party hung up. The plaintiff claims that the longest continuous period of time that the phone rang was "[w]ell past an hour." He states that when he tired of hearing the phone ring, he picked up the receiver and laid it down on a table or chair. He also states that he frequently picked up the receiver and listened to the caller without saying a word. Sometimes, he heard a radio playing and a whistle sound. Other times, he heard an individual making threats and remarks similar to those made by Mr. Holland in his initial call to the plaintiff and similar to the content of the messages recorded by his brother. The plaintiff identified the voice on the other end of the line as Mr. Holland's voice. Due to the defendants' constant calls, the plaintiff was forced to unplug the phone each night and plug it back in the next morning.
Id. at *2-3.
The communications in this case do not rise to the level of the outrageous conduct found to exist in Nairon, nor is it alleged that Robyn held some sort of actual or apparent authority over Roger. Indeed, the only mention of phone calls in the Amended Complaint is that Robyn left "lengthy voicemails," (Doc. No. 9, Amended Complaint ¶ 15), but there is no indication as to the actual number or their tenor. As for emails, the Amended Complaint alleges that Robyn sent "literally hundreds of emails to Roger," over a 3-4 year period, "sending messages several times per week to his work email system from late 2014 into the late spring of 2018). Emails are obviously easier to ignore than the incessant ringing of a phone, and a couple a week pales in comparison to up to 40 a day. No doubt the sheer number of emails received over the years is tiresome, bothersome and nettlesome, but it does not rise to the level of being outrageous as defined and required by the tort of intentional infliction of emotional distress.
E. Negligent Infliction of Emotional Distress
"In Tennessee, [negligent infliction of emotional distress] requires that the plaintiff establish the elements of a general negligence claim: (1) duty, (2) breach of duty, (3) injury or loss, (4) causation in fact, and (5) proximate causation." Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 52 (Tenn. 2004) (citing Camper v. Minor, 915 S.W.2d 437, 446 (Tenn. 1996) ). In addition, plaintiff must "establish a 'serious' or 'severe' emotional injury," which is "one that occurs " 'where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." Marla H. v. Knox Cty., 361 S.W.3d 518, 529 (Tenn. Ct. App. 2011) (citations omitted); accord Camper, 915 S.W.2d at 446 ; Boals v. Murphy, No. W2013-00310-COA-R3CV, 2013 WL 5872225, at *7 (Tenn. Ct. App. Oct. 30, 2013).[3] Further, "[w]hen the claim for negligent infliction of *915 emotional distress is a 'stand-alone' claim, i.e., one for emotional disturbance alone in the absence of a physical injury, the serious or severe mental injury must be proven 'through expert medical or scientific proof,' " but "[w]hen the cause of action for negligent infliction is for 'emotional damages [that] are a 'parasitic' consequence of negligent conduct that results in multiple types of damages,' there is no requirement that the serious or severe mental injury be proven by expert proof." Rogers v. Louisville Land Co., 367 S.W.3d 196, 206 n. 10 (Tenn. 2012) (citations omitted).
In pertinent part, Count Five of the Amended Complaint in this case states:
67. Plaintiffs allege that Defendant owed Plaintiffs a general duty of care to avoid taking actions that would injure Plaintiffs.
68. Defendant breached this duty of care by engaging in the actions as set forth above, including, inter alia, ongoing cyber-harassment, the sending of hundreds of email messages to Plaintiffs, and the distribution to third parties of private conversations, messages and information.
69. As a result of Defendant's negligence, and as explained above, Plaintiffs suffered and continue to suffer severe emotional distress that no reasonable person could be expected to endure, including humiliation, embarrassment, fear, intimation, and physical and mental suffering and concomitant physical ailments.
70. Plaintiffs were forced - over several years-to suffer fear and anxiety that others (including Plaintiff Roger's employers, and Plaintiffs' children and family members) would discover the extent and content of Defendant Robyn's harassing messages and cyber-stalking. Plaintiffs suffered severe emotional distress over those years, fearing that Defendant Robyn would make good on her frequent threats to disseminate defamatory statements and invade Plaintiffs' privacy. Such fear and anxiety was overwhelming and made it difficult for Plaintiffs to function in their personal lives or at their places of employment.
71. After Robyn in fact contacted numerous of Plaintiff's friends and family, Plaintiffs suffered additional severe mental anguish, humiliation, embarrassment and anxiety knowing that many of their friends, family and others in their community were aware of Defendant Robyn's defamatory accusations and had been made aware of personal and private facts and communications. As a result, Plaintiffs have suffered from feelings of fear, helplessness, anxiety, difficulty concentrating, as well as physical symptoms, such as headaches and sleeplessness.
72. Defendant's negligence was, at the very least, a substantial factor in causing Plaintiffs' severe emotional distress and resulting physical illness.
(Doc. No. 9, Amended Complaint ¶¶ 67-72). This is little more than "a formulaic recitation of the elements of a cause of action" for the negligent infliction of emotional distress and "will not do." Twombly, 550 U.S. at 557, 127 S.Ct. 1955.
Regardless, "in the elements that must be established for a claim of negligent infliction of emotional distress, the requirement that the stimulus conduct be extreme and outrageous is interwoven with the 'reasonable person' component of the element of serious or severe emotional injury." Brown v. Mapco Exp., Inc., 393 S.W.3d 696, 706 (Tenn. Ct. App. 2012). "In effect, the plaintiff must prove that the conduct giving rise to his claim was so extreme and outrageous that it would have caused a reasonable person to suffer serious *916 or severe emotional injury." Id. ; accord Etheridge v. E.I. DuPont De Nemours & Co., No. 2:14-02443-SHL-CGC, 2015 WL 12516226, at *6 (W.D. Tenn. Mar. 16, 2015) ; Foster v. Amarnek, No. 3:13-516, 2014 WL 1961245, at *8 (M.D. Tenn. May 14, 2014). For reasons already stated in relation to the intentional infliction of emotional distress claims, the conduct about which Plaintiffs complain does not rise to that level.
IV. CONCLUSION
For the reasons set forth above, the Motion to Dismiss for improper venue or alternatively to transfer (Doc. No. 5) will be denied. The Motion to Dismiss for failure to state a claim (Doc. No. 18) will be granted in part and denied in part. The Motion will be granted with respect to Plaintiffs' intrusion into seclusion, and their intentional and negligent infliction of emotional distress claims. The Motion will be denied with respect to Plaintiffs' defamation and public disclosure of private facts claims.
An appropriate Order will enter.

Because Plaintiffs are a married couple, the Court will hereafter identify them by their first names. The Court will also identify Defendant by her first name to maintain parity and to avoid any confusion that might be generated by her surname and Kerry Finley's first name.

In her reply, Robyn argues that "Plaintiffs 'cannot use discovery to obtain specific facts necessary to craft a plausible complaint,' " quoting Life for Relief v. Charter One Bank, N.A., No. 12-CV-13550, 2013 WL 3810255 at *3 (E.D. Mich. July 23, 2013). (Doc. No. 25 at 4). However, "[p]lausibility is a context-specific inquiry, and the allegations in the complaint must 'permit the court to infer more than the mere possibility of misconduct.' " Ctr. for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 369 (6th Cir. 2011) . As stated by the Supreme Court in Twombly, 550 U.S. at 556, 127 S.Ct. 1955, Rule 12(b)(6) "does not impose a probability requirement at the pleading; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." Thus, "[h]aving informed [defendant] of the factual basis for their complaint, [plaintiffs] were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim." Johnson v. City of Shelby, 574 U.S. 10, 135 S. Ct. 346, 347, 190 L.Ed.2d 309 (2014).

In her reply, Robyn notes that the "unable to cope" standard has been called into doubt because one can learn to cope with almost anything. However, this Court is required to apply Tennessee law, and Tennessee "is one of thirteen states using this definition," Eskin v. Bartee, 262 S.W.3d 727, 735 n.12 (Tenn. 2008), and "[t]his definition is also consistent with leading treatises on the subject, as well as the Restatement (Second) of Torts, McGarity v. Jerrolds, 429 S.W.3d 562, 578 (Tenn. Ct. App. 2013).